**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| JOSHUA EDDY, | |
| Plaintiff, | |
| vs. | NO. 3:20-CV-425-TAV-DCP |
| FRANK T. SINITO; MILLENNIA HOUSING MANAGEMENT, LTD.; and SUMMIT 2192 TN, LLC, | JURY DEMANDED |
| Defendants. | |

## AMENDED COMPLAINT

Joshua Eddy brings this action against Frank T. Sinito, Millennia Housing Management, Ltd., and Summit 2192 TN, LLC (collectively "Defendants") for catastrophic personal injuries he suffered, consisting mainly of third-degree burns over most of his body, while residing at Summit Towers Apartments in Knoxville, Tennessee.

### PARTIES

1. Plaintiff Joshua Eddy is a citizen and resident of Tennessee. At all times relevant to this action, Mr. Eddy resided at Summit Towers Apartments, 201 Locust St., Knoxville, Tennessee 37902. At the time of the injury at issue, Mr. Eddy was a 36-year-old man who had a medically managed disability of epilepsy.

2. Defendant Frank T. Sinito is a citizen and resident of Cleveland, Ohio. Mr. Sinito is the managing member of Defendant Summit 2192 TN, LLC, and Defendant Millennia Housing Management, Ltd. Frank T. Sinito also serves as the CEO of the Millennia Companies,[1] a group

---

[1] Upon information and belief, "The Millennia Companies" is not an actual company, but a trademark registered by Defendant Millennia Housing Management, Ltd. with the U.S. Patent and Trademark Office under serial number 85913063.

1

of umbrella entities that advertise themselves as "focus[ing] on building affordable housing and commercial development. The organization has built over 23,000 units across 23 states."[2] Plaintiff names Mr. Sinito individually upon information and belief that he has attempted to insulate himself and his businesses from liability for malfeasance through the use of underfunded shell companies, all of which may be incapable of satisfying a judgment in an amount necessary to fully compensate Mr. Eddy for his injuries.

3. Defendant Millennia Housing Management, Ltd. is an Ohio limited liability company with a corporate headquarters located at 4000 Key Tower, 127 Public Square, Cleveland, Ohio 44114. Millennia Housing Management, Ltd. manages more than 30,000 apartment units nationally. Upon information and belief, Millennia Housing Management, Ltd. was at all times relevant to this action the property manager of Summit Towers Apartments and the actual employer of the culpable individuals named herein, whose tortious conduct proximately caused Mr. Eddy's injuries.

4. Defendant Summit 2192 TN, LLC is a limited liability company registered in Tennessee with a corporate headquarters located at 4000 Key Tower, 127 Public Square, Cleveland, Ohio 44114. Summit 2192 TN, LLC owns Summit Towers Apartments, 201 Locust St., Knoxville, Tennessee 37902, and registered Summit Towers Apartments as an assumed name for Summit 2192 TN, LLC in 2016. Summit 2192 TN, LLC has only two registered members— Summit 2192 Investment, LLC and Frank T. Sinito—and both are citizens of Ohio. While Summit 2192 TN, LLC is a limited liability company registered in Tennessee, "a limited liability company has the citizenship of each of its members." *Delay v. Rosenthal Collins Grp., Inc.*, 585 F.3d 1003,

---

[2] https://lockkeepers.com/frank-sinito-malisse-sinito (last accessed August 29, 2020).

2

1005 (6th Cir. 2009). Since all of the members of Summit 2192 TN, LLC are citizens of Ohio, Summit 2192 TN, LLC has Ohio citizenship for purposes of jurisdiction.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action under 28 U.S.C. § 1332 because the citizenship of the Plaintiff (Tennessee) is completely diverse from the citizenship of all Defendants (Ohio), and the matter in controversy exceeds the value of $75,000.00.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND FACTS

7. Summit Towers Apartments ("Summit Towers") is a twelve-story apartment complex in Knoxville, Tennessee. Summit Towers is a public housing complex subsidized by the United States Department of Housing and Urban Development ("HUD"). Summit Towers advertises itself as "an apartment community for those 62 and better, handicapped, or disabled."[3] It describes its apartments as "thoughtfully designed with your comfort and convenience in mind. In addition to our great floor plans and maintenance free living, our community has the amenities you want and deserve."[4] This has been advertised on the Summit Towers website since at least 2016.[5]

8. Summit 2192 TN, LLC took ownership of Summit Towers in 2016. Millennia Housing Management, Ltd. ("Millennia") began managing Summit Towers that same year.

---

[3] http://www.summit-towers.com/ (last accessed August 29, 2020).

[4] *Id.*

[5] Internet Archive, Wayback Machine, October 9, 2016, https://web.archive.org/web/20161009091900/http://summit-towers.com/ (last accessed September 13, 2020).

Millenia employs the managers, maintenance crew, and various other staff members responsible for operating and managing the property.

9. Mr. Eddy suffered catastrophic burn injuries in this case solely because Summit Towers had a defective water heating system and defective shower valves.

10. A typical apartment building water heating system has three elements: a boiler, a holding tank, and the piping that runs from the boiler to the holding tank and from the holding tank to the individual apartments. The boiler initially heats the water to high temperatures, ranging between 150° and 180° Fahrenheit ("F"), to inhibit the growth of legionella bacteria. Once heated, the water exits the boiler through a pipe that runs into a holding tank. From there, the hot water can be distributed throughout the building to the individual apartments.

11. In between the boiler and the pipes leaving the tank, there is typically a thermostatic mixing valve regulating the temperature of the water that is eventually distributed from the holding tank. A mixing valve mixes the hot water from the boiler with cold water, which reduces the water temperature to levels that are safer for contact with human skin, typically around 120°F. Without a mixing valve, the system cannot regulate the water temperature in this way and will distribute hot water throughout the building at whatever temperature it is originally heated to by the boiler. In the absence of a thermostatic mixing valve, there is an ever-present danger of "scalding from excessively hot water."[6]

12. The water boiler at Summit Towers was a Camus Dynaforce DR1400. The instruction and operation manual for this model expressly calls for "the use of a properly sized

_____

[6] Waters, Robert, "Thermostatic mixing valves: Applications in plumbing and hydronic heating," HPAC Magazine, May 30, 2018, https://www.hpacmag.com/features/1004124380/ (last accessed August 29, 2020).

4

thermostatic mixing valve to supply domestic hot water at temperatures less than 140°F (60°C)" and expressly warns that "[a]dequate care MUST be taken to prevent potential scald injury when storing water at 140°F (60°C) and hotter."[7]

13. The Public Housing Modernization Standards Handbook 7485.2, which is published by HUD, says that "[d]omestic hot water heater systems shall have the capacity to maintain a minimum water temperature of l00F. The maximum water temperature shall not exceed l20F at the tap for typical dwelling unit use."[8] The defective water heating system at issue was a safety and health hazard and should have been replaced to conform to this standard.

14. HPAC (Heating, Plumbing, and Air Conditioning) Magazine, a publication for management-level mechanical industry personnel,[9] explains the extreme danger of high-temperature water from an improperly regulated water heating system:

> Scalding from the exposure to very hot water involves the destruction of skin cells and sometimes the underlying structures of muscle. Scalding can produce burns just as damaging as a burn from fire. Research has shown that scalding burns from hot water can occur in just seconds–even less for small children with thin tender skin. Also, the slow reaction time of the elderly and the handicapped make them particularly vulnerable to serious hot water burns.
>
> A water temperature of 60C (140F) can cause a third-degree burn on adults in five seconds, and with children of 0 to five years old in three seconds. To prevent scalding, the solution is to keep the water temperature below 49C [120°F].[10]

---

[7] http://camus-hydronics.com/media/1919/installation-operation-service-manual-99-0171-rev07.pdf

[8] https://www.hud.gov/sites/documents/74852C6PIHH.PDF (last accessed September 13, 2020).

[9] About Page, HPAC Magazine, https://www.hpacmag.com/about/ ("HPAC Magazine's editorial is written for management level mechanical industry personnel who have documented training in the mechanical fields in which they work.") (last accessed August 29, 2020).

[10] *Id.*; *see also* High Temperature Safety, University of Wisconsin-Madison, https://safety.ep.wisc.edu/hazards/high-temperature-safety ("Hot liquid causes 3rd degree burns . . . in 5 seconds at 140 degrees Fahrenheit (60 C), in 2 seconds at 149 degrees Fahrenheit (65 C), in 1 second at 156 degrees Fahrenheit (69 C).") (last accessed August 29, 2020).

15.     At all times relevant to this action, the water heating system at Summit Towers did not have a thermostatic mixing valve.  The employees and management at Summit Towers and Millennia knew that the water heating system did not have a mixing valve, and that the system needed to be significantly updated or completely replaced.  The employees and management at Summit Towers and Millennia knew that the shower valve in Plaintiff Eddy's apartment was improper and needed to be changed.

16.     At least as early as August 2019, employees of both Summit Towers and upper-level management at Millennia knew that the water at Summit Towers was reaching dangerously hot temperatures that could injure residents. Summit Towers employees, including managers and maintenance staff, reported this to high-level management at Millennia, but the issue with the dangerously hot water was never addressed.

17.     Upon information and belief, instead of installing a properly functioning water heating system that would safely distribute hot water to all of the floors at Summit Towers, the Defendants made a conscious business decision to heat the building's water to dangerously hot temperatures so that by the time the water from the water heating system on the first floor reached the top floors of the building, the water was still hot.  This method, however, left the residents on lower floors with dangerously hot water.

**INJURY**

18.     Mr. Eddy was diagnosed with epilepsy when he was seventeen years old.  At all times relevant to this action, he had a medically managed disability of epilepsy.

19.     Mr. Eddy chose to reside at Summit Towers because it advertised itself as an apartment complex designed for disabled persons.

6

20. On or around May 7, 2020, Mr. Eddy was showering in his apartment on the fifth floor of Summit Towers. While in the shower, Mr. Eddy suffered an epileptic seizure causing him to fall such that he was immersed in and scalded by excessively hot water, with the result that he suffered third-degree burns over most of his body.

21. Mr. Eddy was taken by EMS to the University of Tennessee Medical Center and was then air lifted to the intensive care unit of the Vanderbilt Burn Center. At the Vanderbilt Burn Center, Mr. Eddy underwent multiple skin surgeries. As of the time of the filing of this action, his hospital bills alone exceed $4,000,000.00. These injuries have left Mr. Eddy permanently disfigured and will require years of additional treatment and care.

22. On May 8, 2020, the day after Mr. Eddy suffered his injuries, a Summit Towers employee measured the water temperature in Mr. Eddy's apartment at 151°F.

## CAUSES OF ACTION

### Count I
### Common Law Negligence
### (Against All Defendants)

23. Summit 2192 TN, LLC as the owner of the premises at Summit Towers, had a duty to ensure that Mr. Eddy's dwelling was safe in general and, in particular, that the water heating system and shower valve operated safely.

24. Summit 2192 TN, LLC allowed Summit Towers to fall into disrepair and therefore created a dangerous condition that caused Plaintiff Joshua Eddy's injuries. Furthermore, using a water heating system without a mixing valve or a proper shower valve created a dangerous condition that caused Plaintiff Joshua Eddy's injuries.

25. Millennia, as the management company for the premises at Summit Towers, had a duty to use reasonable care in managing the property. In particular, after being notified by

7

employees of the dangerously high water temperature, Millennia had a duty to ensure the water heating system had a properly functioning mixing valve, and that the shower in Mr. Eddy's apartment had a proper shower valve. Millennia's failure to exercise reasonable care to fulfill its management duties created the dangerous condition that caused Mr. Eddy's injuries.

26. Upon information and belief, the decision of whether or not to upgrade the water heating system for Summit Towers rose to upper-level Millennia management, including Defendant Frank T. Sinito himself, who having been notified of the complaints of dangerously high water temperature, consciously decided to not upgrade the water heating system for budgetary reasons. The failure of Summit 2192 TN, LLC and upper-level management, including Frank T. Sinito, to exercise reasonable care created the dangerous condition that caused Mr. Eddy's injuries.

27. The Defendants' failure to exercise reasonable care was the sole cause in fact and proximate cause of Mr. Eddy's injuries.

**Count II**
**Negligence Per Se**
**(Against Defendants Millennia and Summit 2192 TN, LLC)**

28. Millennia and Summit 2192 TN, LLC are liable for negligence per se in that they violated building codes adopted by the State of Tennessee, Knox County, Tennessee, the City of Knoxville, Tennessee, and HUD that mandate a specific course of conduct for residential buildings.

29. The State of Tennessee adopted the International Plumbing Code 2012 (IPC 2012).[11] Both Knox County, Tennessee and the City of Knoxville, Tennessee adopted the

---

[11] Tenn. Comp. R. & Regs. R. 0780-02-02-.01(1)(d) (stating that the "the required minimum standards for fire prevention, fire protection, and building construction safety in the State of Tennessee" include "The International Plumbing Code (IPC), 2012 edition.").

8

International Plumbing Code 2018 (IPC 2018).[12] The Defendants violated Tennessee, Knox County, and City of Knoxville plumbing codes, which state:

> Individual shower and tub-shower combination valves shall be balanced-pressure, thermostatic or combination balanced-pressure/thermostatic valves that conform to the requirements of ASSE 1016 or ASME A112.18.1/CSA B125.1 and shall be installed at the point of use. Shower and tub-shower combination valves required by this section shall be equipped with a means to limit the maximum setting of the valve to 120°F (49°C), which shall be field adjusted in accordance with the manufacturer's instructions. In-line thermostatic valves shall not be utilized for compliance with this section.

https://up.codes/viewer/tennessee/ipc-2012/chapter/4/fixtures-faucets-and-fixture-fittings#424.3; International Plumbing Code (2018) § 412.3.

**501.2 Water Heater as Space Heater**

> Where a combination potable water heating and space heating system requires water for space heating at temperatures higher than 140°F (60°C), a master thermostatic mixing valve complying with ASSE 1017 shall be provided to limit the water supplied to the potable hot water distribution system to a temperature of 140°F (60°C) or less. The potability of the water shall be maintained throughout the system.

https://up.codes/viewer/tennessee/ipc-2012/chapter/5/water-heaters#501.2; International Plumbing Code (2018) § 501.2.

**502.1 General**

> Water heaters shall be installed in accordance with the manufacturer's installation instructions. Oil-fired water heaters shall conform to the requirements of this code

---

[12] Knox County, Tennessee Ordinances, Sec. 10-136, https://library.municode.com/tn/knox_county/codes/code_of_ordinances?nodeId=PTIICO_CH10 BUBURE_ARTVII2018INPLCOIP ("The county hereby adopts the 2018 edition of the International Plumbing Code, published by the International Code Council, Inc., by reference, as if set out at length in this section, with the amendments set out in this article.")(last accessed December 8, 2020).

City of Knoxville, Tennessee Ordinances, Sec. 6-106, https://library.municode.com/tn/knoxville/codes/code_of_ordinances?nodeId=PTIICOOR_CH6 BUBURE_ARTVPLCO_S6-106AD ("The International Plumbing Code, 2018 edition, and Appendices B, C, D, and E, as modified by the provisions of this article, is hereby adopted as the Plumbing Code of the City of Knoxville.") (last accessed September 13, 2020).

9

and the International Mechanical Code. Electric water heaters shall conform to the requirements of this code and provisions of NFPA 70. Gas-fired water heaters shall conform to the requirements of the International Fuel Gas Code.

https://up.codes/viewer/tennessee/ipc-2012/chapter/5/water-heaters#502.1; International Plumbing Code (2018) § 502.1.

### 607.1.1 Temperature Limiting Means

A thermostat control for a water heater shall not serve as the temperature limiting means for the purposes of complying with the requirements of this code for maximum allowable hot or tempered water delivery temperature at fixtures.

https://up.codes/viewer/tennessee/ipc-2012/chapter/6/water-supply-and-distribution#607.1.1; International Plumbing Code (2018) § 607.1.1.

### 607.1.2 Tempered Water Temperature Control

Tempered water shall be supplied through a water temperature limiting device that conforms to ASSE 1070 and shall limit the tempered water to a maximum of 110°F (43°C). This provision shall not supersede the requirement for protective shower valves in accordance with Section 424.3.

https://up.codes/viewer/tennessee/ipc-2012/chapter/6/water-supply-and-distribution#607.1.2; International Plumbing Code (2018) § 607.1.2 (replacing "Section 424.3" with "Section 412.3").

30. Tennessee's Uniform Residential Landlord and Tenant Act mandates that landlords "[c]omply with requirements of applicable building and housing codes materially affecting health and safety." Tenn. Code Ann. § 66-28-304.

31. HUD requires that all HUD-subsidized housing be "decent, safe, sanitary and in good repair," 24 CFR 5.703(a), and that "[a]ll areas and components of the housing must be free of health and safety hazards." 24 CFR 5.703(f). This requires that "[a]ll areas and aspects of the dwelling unit" including the "hot water heater . . . must be free of health and safety hazards, functionally adequate, operable, and in good repair." 24 CFR 5.703(d)(1). Further, HUD housing must adhere to state and local codes for "building and maintenance." 24 CFR 5.703(g).

10

32.     Defendants Millennia and Summit 2192 TN, LLC had a duty to ensure that Summit Towers' water heating system and showers conformed to these building codes.

33.     These building codes are intended to protect the health and safety of residents, including the residents of Summit Towers.

34.     Millennia and Summit 2192 TN, LLC's failure to comply with these building codes was the cause in fact and proximate cause of Mr. Eddy's injuries.

**Count III**
**Gross Negligence/Punitive Damages**
**(Against All Defendants)**

a. **Conduct at Summit Towers**

   i. **Water Heating System**

35.     Because Defendants Summit 2192 TN, LLC and Millennia advertised Summit Towers as an apartment complex for elderly, handicapped, and disabled persons, they assumed a heightened duty to ensure that Summit Towers was safe for residents with handicaps and disabilities.

36.      Defendants Summit 2192 TN, LLC and Millennia's reckless disregard of the state of the water heating system at Summit Towers, in the face of multiple continuous notifications from employees for nearly a year that the water heating system was reaching dangerously hot temperatures that could injure residents, constitutes clear and convincing evidence of their conscious indifference to the safety of their residents and others who might visit the premises.

37.     Due to their conscious indifference to the safety of their residents and others who might visit the premises at Summit Towers, the Defendants are liable for punitive damages. Such damages are designed to punish them, deter them from committing acts of similar nature in the future, and to make a public example regarding such conduct.

11

### ii. Code Violations

38.     Summit Towers has had three HUD REAC inspections in the last six years, two of them since Millennia managed the property.   REAC inspections are the physical property inspections performed by HUD for all HUD-subsidized housing.  Summit Towers received REAC scores of 87c in 2014.  In the years since Millenia took over management of the building, Summit Towers received scores of 61c in 2017 and 71c in 2018. HUD's website explains that the number is a score based on a rating criteria, but "[t]he lower-case letter 'c' is given if one or more exigent/fire safety (calling for immediate attention or remedy) H&S deficiencies were observed."[13] Thus, their last three HUD inspections have found at least one exigent/fire safety issue that required emergency attention.

39.     It is Millennia policy to perform internal inspections of its housing units before all HUD REAC inspections.  Millennia uses both corporate and local staff to do these inspections when performed.  Even though both corporate and local staff performed these inspections, all HUD inspections performed in the last four years have found emergent safety issues.

40.     The Knox County Fire Department has found violations of the 2012 International Fire Code at Summit Towers every year between 2016 and 2019.

41.     These code violations, along with the multiple code violations listed in Count II above, constitute clear and convincing evidence of Defendant Summit 2192 TN, LLC and Millennia's pattern and practice of conscious indifference to the safety of their residents and others who might visit the premises.

---

[13] Physical Inspection Summary Report (Ver 2.3), United States Department of Housing and Urban Development,
https://www.hud.gov/program_offices/public_indian_housing/reac/products/pass/pass_isrpt  (last accessed September 2, 2020).

### b. Vicarious Liability for Punitive Damages

42. At all relevant times, both the Summit Towers' property manager and the district/regional manager demonstrated a pattern and practice of conscious indifference to the safety of their residents and others who might visit the premises. In addition, both the Summit Towers property manager and the district/regional manager are Millennia personnel employed in a management capacity acting within the scope of their employment.

43. Millennia was reckless in hiring, retaining, and supervising the personnel who managed Summit Towers.

44. Upon information and belief, Defendants Millennia and Frank T. Sinito authorized, ratified, and approved the acts and omissions described above with reckless disregard of the obvious extreme consequences that could result.

45. Due to their pattern and practice of conscious indifference to the safety of their residents and others who might visit the premises at Summit Towers, the Defendants Millennia and Frank T. Sinito are vicariously liable for the recklessness and gross negligence of their employees and agents. Tenn. Code Ann. § 29-39-104(g).

### c. Part of a Nationwide Pattern of Reckless Conduct

46. Mr. Eddy's injury is just one example of Defendants Millennia and Frank T. Sinito's nationwide pattern and practice of conscious indifference to the safety of residents and others who might visit low-income housing communities it owns and/or manages across the country.

### i. Kansas City, Missouri

47. In 2018, HUD inspected the Englewood Apartments complex in Kansas City, Missouri managed by Millennia and owned by a limited liability company of which Defendant

13

Frank Sinito was the managing member. The apartments received a below average rating. The tenants, however, still complained that the living conditions were unbearable.[14]

48. In 2019, the City of Kansas City conducted its own inspection of thirty-three units at the complex and found one-hundred fifteen health code violations, including "sewage back-up, exposed electrical wiring, excessive live cockroach infestation, and ceilings that were caved in or falling."[15]

49. A week later, the City of Kansas City re-inspected the facility and found that most of the code violations were not corrected.[16]

50. In 2020, HUD's Office of the Inspector General performed an audit of Englewood Apartments and recommended that Millennia be fined approximately $400,000.00 for violations. The audit found that Millennia failed to properly inspect apartments, filed for HUD subsidies with non-qualifying tenants (including claiming a subsidy for an apartment that was allegedly being rented by a tenant who HUD later determined to have been deceased before the paperwork was signed), and rented out apartments that were deemed "not in a decent, safe, and sanitary condition."[17]

---

[14] Nick Starling, "Englewood Apartments hit with 115 violations; city forces tenants out," September 4, 2019, KSHB 41 Kansas City, https://www.kshb.com/news/local-news/englewood-apartments-hit-with-115-violations-city-forces-tenants-out (last accessed September 2, 2020).

[15] *Id.*

[16] Cat Reid, "Health department re-inspection uncovers more issues at Englewood Apartments," KSHB 41 Kansas City, https://www.kshb.com/news/local-news/health-department-re-inspection-uncovers-more-issues-at-englewood-apartments (last accessed September 2, 2020).

[17] Ronald J. Hosking, HUD OIG Office of Audit 7, June 8, 2020 Report, https://www.hudoig.gov/sites/default/files/2020-06/2020-KC-1001.pdf (last accessed September 2, 2020).

### ii. Atlanta, Georgia

51.     In November 2019, Geraldine Collins, President of the National Alliance of HUD Tenants, testified before Congress.[18]  In her testimony, she stated that she personally visited Forest Cove Apartments in Atlanta, Georgia, which is also managed by Millennia.  She presented to Congress fifty-five pages of slides, including hundreds of photos of unlivable conditions, including black mold, falling ceilings, exposed electrical wiring, rat infestations, and cockroach infestations.[19]

52.     Ms. Collins testified that even though the photos were shown to Defendant Frank Sinito and other upper-level management at Millennia in early 2018, these problems were never addressed.

### iii. Opa-locka, Florida

53.     In 2016, Millennia purchased and began managing the Cordoba Courts apartment complex in Opa-locka, Florida. Upon information and belief, Frank T. Sinito exercised control over the companies who owned and managed this complex. Like other Millennia properties, Cordoba Courts was found to suffer from serious hygiene and safety issues, including mold, rodent infestations, and a malfunctioning sewage system.

54.     In 2018, the local residents' association met with Defendant Frank Sinito and upper-level management from Millenia about these issues. Mr. Sinito actually visited the property

---

[18] Testimony of Geraldine Collins, House Financial Services Committee, Subcommittee on Housing, Community Development and Insurance, November 20, 2019, https://www.congress.gov/116/meeting/house/110250/witnesses/HHRG-116-BA04-Wstate-CollinsG-20191120.pdf (last accessed September 13, 2020).

[19] *See id.* n.4, https://drive.google.com/file/d/1h8t8EWTJPeJR4a3ZANXXrfshcZVx8w54/view (last accessed September 13, 2020).

in 2018.  Despite Mr. Sinito's direct knowledge of these problems, they were never adequately addressed.

55.	In 2019, videos were taken by residents showing ankle-high sewage backup.[20]

56.	In 2020, the Opa-locka City Commission fined Millennia $200,000.00.  After the fine, Millennia agreed to fix the sewage backup and mold at Cordoba Courts in ninety days if the City reduced or eliminated the fine.[21]

### iv.  Jacksonville, Florida

57.	In July 2019, in Jacksonville, Florida, seven people were hospitalized, including four people who were placed in critical care, after a fire occurred at the Calloway Cove apartment complex owned and operated by Defendants Millennia and Frank T. Sinito.[22] Three of the four critically injured victims stayed in the hospital for four months, while one of them remained longer.[23] The victims suffered burns on 60-95% of their bodies, necessitating in some cases limb amputation and causing permanent disfigurement for all.[24]

---

[20] Aaron Leibowitz, "Building owner fined $200K for moldy apartments is asking the city for a 'fresh start,'" Miami Herald, February 3, 2020, https://www.miamiherald.com/news/local/community/miami-dade/miami-gardens/article239772988.html (last accessed September 2, 2020).

[21] *Id.*

[22] Scott Johnson and Erik Avanier, "3 children, mother critically injured in apartment fire," News4JAX, July 25, 2019, https://www.news4jax.com/news/2019/07/26/3-children-mother-critically-injured-in-apartment-fire/ (last accessed September 8, 2020).

[23] Amber Krycka, "Jacksonville family burned in fire gets help from burn survivor; looking to community to fill home," Action News JAX, November 20, 2019, https://www.actionnewsjax.com/news/local/jacksonville-family-burned-in-fire-gets-help-from-burn-survivor-looking-to-community-to-fill-home/1010848289/ (last accessed September 8, 2020).

[24] Kelly Wiley, "Woman, children burned during apartment fire still being treated," News4Jax, August 29, 2019, https://www.news4jax.com/news/2019/08/29/woman-children-burned-during-apartment-fire-still-being-treated/ (last accessed September 8, 2020).

58.     The apartment complex had numerous previous fire code violations, including two failed fire inspections in 2018.[25]

59.     An inspection performed by the State Fire Marshall's Office after the fire found numerous code violations, "including a failure to provide appropriate carbon monoxide monitoring and installation in the complex, and failure to provide working smoke detectors throughout the facility."[26]

### d. Millennia's Incentive Structure and Corporate Culture

60.     Defendants Millennia and Frank T. Sinito promote the pattern of reckless conduct from its corporate and local employees by offering increased pay and bonuses for meeting budgetary goals that can be met only through cost-cutting measures that ignore common sense, technological necessities, and legally required safety and hygiene standards in Millennia properties. Without question, this system incentivizes employees to place profits over people, finances over safety.

61.     Upon information and belief, this incentive structure was created by or ratified by Defendant Frank T. Sinito.

---

[25] Kelly Wiley and Francine Frazier, "I-TEAM: Previous fire violations at complex where major blaze sparked," News4Jax, July 24, 2019, https://www.news4jax.com/news/2019/07/24/i-team-previous-fire-violations-at-complex-where-major-blaze-sparked/ (last accessed September 8, 2020).

[26] Kelly Wiley, "Calloway Cove Apartments fails inspection after massive fire," News4Jax, July 26, 2019, https://www.news4jax.com/news/2019/07/26/calloway-cove-apartments-fails-inspection-after-massive-fire/ (last accessed September 8, 2020).

17

62. This corporate culture means that residents suffer while Defendant Millennia is enriched off of an estimated annual revenue of $220,000,000.00.[27]

**Count IV**
**Piercing the Corporate Veil**
**(Against Defendant Frank T. Sinito)**

63. Defendant Frank T. Sinito is the managing member and principal owner of all of the Defendant business entities. Furthermore, all of the Defendant entities, whether registered in Tennessee or Ohio, operate from the Key Tower in Cleveland, Ohio, a building that Mr. Sinito owns.

64. Mr. Sinito is directly involved in all of the decisions for major improvements on Millennia properties, including the decision to ensure the water heating system at Summit Towers was functioning properly. As the HUD Office of Inspector General confirms, "day-to-day activities [at Millennia properties] are managed at the property, while most of the financial operations are managed at the management agent's home office in Cleveland, OH."

65. Defendant Frank T. Sinito is the managing member of hundreds of limited liability companies and managing partner of hundreds of limited partnerships throughout the United States, over four hundred in Ohio alone.

66. In order to facilitate his scheme to maintain Summit Towers (and numerous other properties nationwide) in alarming disrepair, Defendant Frank T. Sinito uses a vast series of shell companies to hide assets. He grossly underfunds any companies that could be potentially liable

---

[27] Dun & Bradstreet, Financial Statements, Millennia Housing Management, Ltd., https://www.dnb.com/business-directory/companyprofiles.millennia_housing_management_ltd.6573f14e951b403a6dcb2b4a2121fe14.html (last accessed September 2, 2020).

18

for his malfeasance but exercises complete financial authority over actions of all his business associations, controlling the nearly 30,000 units under the Millennia Companies umbrella.

67. Upon information and belief, Defendant Frank T. Sinito advertises to the public and to governmental agencies that the properties he purchases and manages are safe and habitable for the disabled and elderly–earning his companies government contracts from HUD, which directly benefit him personally as the managing member of each company—when he in fact knowingly and recklessly keeps them in alarming disrepair, placing the safety and health of the residents of his apartment complexes in serious danger.

68. On December 2, 2019, Defendant Frank T. Sinito personally certified in a public document to HUD and the Tennessee Housing Development Agency ("TDHP") that the amenities at Summit Towers are in average quality and condition. He further certified that there were no known factors at Summit Towers that could adversely impact the marketability of any of the subject units from a rental standpoint. Defendant Sinito said this while knowing that the water heating system at Summit Towers was reaching dangerously hot temperatures that could injure residents. Mr. Sinito said this in order to increase rents at Summit Towers and profit both his companies and himself. This constitutes fraud that warrants piercing the corporate veil.

69. Because Defendant Frank T. Sinito controls all of the Defendant entities, knowingly misrepresents their quality in public documents to government agencies, while yet keeping any business entities that could be held civilly liable undercapitalized, justice requires that Plaintiff Joshua Eddy be allowed to pierce the corporate veil and hold Defendant Frank T. Sinito personally liable for the damages in this case.

70. Because there is no reasonable basis to separate Defendant Frank T. Sinito's business activities from his personal interests, and because of the magnitude of his mismanagement

and conscious indifference to the safety of others, Plaintiff Joshua Eddy asserts that the corporate veil must be pierced under these facts so that Defendant Frank T. Sinito is held personally liable for the damages in this case.

**Count V**
**Civil Conspiracy**
**(Against All Defendants)**

71.     If the Defendant business entities are determined to be legally distinct from Defendant Frank T. Sinito himself, then the Defendants are engaged in a civil conspiracy through a common plan to accomplish lawful purposes (renting apartments) by unlawful means (knowingly furnishing unsafe apartments and mismanaging residential properties and making fraudulent advertisements about the health and safety of those apartments as described above).

72.     In order to facilitate this conspiracy to maintain Summit Towers (and numerous other properties nationwide) in alarming disrepair, Defendant Frank T. Sinito and the other Defendants advertise to the public and to governmental agencies that the properties they purchase and manage are safe and habitable for the disabled and elderly when they in fact knowingly and recklessly keep them in alarming disrepair, placing the safety and health of the residents of the apartment complexes in serious danger.

73.     The Defendants conspired to (1) rent unsafe apartments at Summit Towers to disabled, handicapped, and elderly residents in Knox County, Tennessee, and (2) receive government subsidies for such rents.

74.     On December 2, 2019, Defendant Frank T. Sinito personally certified in a public document to HUD and the Tennessee Housing Development Agency ("TDHP") that the amenities at Summit Towers are in average quality and condition. He further certified that there were no known factors at Summit Towers that could adversely impact the marketability of any of the

20

subject units from a rental standpoint. Defendant Sinito said this while knowing that the water heating system at Summit Towers was reaching dangerously hot temperatures that could injure residents. Mr. Sinito said this in order to increase rents at Summit Towers and profit both his companies and himself.

75. Because of this conspiracy, Plaintiff Joshua Eddy was deceived into renting an unsafe apartment at Summit Towers and incurred his physical injuries outlined above.

## PRAYER FOR RELIEF

Wherefore, Mr. Eddy seeks a joint and several judgment against the Defendants of Twenty-Five Million Dollars in compensatory damages (jointly and severally), including bodily injuries, past and future medical expenses, lost wages, loss of earning capacity, pain and suffering, loss of enjoyment of life, and permanent disfigurement, and Seventy-Five Million Dollars in punitive damages (jointly and severally).

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: December 11, 2020      **RESPECTFULLY SUBMITTED,**

By:    s/Gregory F. Coleman
Gregory F. Coleman (TN BPR #14092)
Adam A. Edwards (TN BPR # 023253)
Mark E. Silvey (TN BPR # 013415)
Justin G. Day (TN BPR # 033267)
Louis W. Ringger, III (TN BPR # 033674)
**GREG COLEMAN LAW PC**
*Attorneys for Plaintiff*
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
T: 865-247-0080
F: 865-522-0049

21